UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

                              CRIMINAL CASE NO. 05-50082

v.

JAMES DEVON KING,                    HONORABLE PAUL V. GADOLA
                                              U.S. DISTRICT COURT
                Defendant.
_____/

## ORDER DENYING MOTION TO SUPPRESS

Defendant James Devon King is charged with possession with intent to distribute 50 grams or more of cocaine base, commonly known as crack cocaine, in violation of 21 U.S.C. § 841(a)(1). Before the Court is Defendant's motion to suppress statements and physical evidence, filed on November 29, 2005. The Court held an evidentiary hearing on the matter. For the reasons stated below, the Court will deny the motion to suppress.

**I.     Background**

On May 23, 2005, after receiving an anonymous tip that Defendant James Devon King was selling cocaine from his residence at 1123 Lyon Street, in Flint, Michigan, the police began conducting surveillance of the residence. At approximately 6:50 p.m., Defendant left his residence and drove away in a tan Oldsmobile. Defendant was followed by the police and was eventually stopped for a seat-belt violation by Genesee County deputy Jeffrey Antcliff. After discovering that Defendant did not have a valid driver's license, Defendant was arrested and brought to the Genesee County Sheriff's Department.

Defendant testified that when he got out of the police vehicle at the station and the fresh air

hit him, his knees buckled and he had to be held and steadied by the police officers. Antcliff denies steadying Defendant or even noticing that Defendant was unsteady on his feet.

At the station, Antcliff noticed a white substance around Defendant's mouth and saw Defendant vomit or spit up thick white saliva and the remains of some plastic baggies. Defendant told Antcliff that he had swallowed drugs before he was initially pulled over by Antcliff. Also present at the police station was Officer Felix Trevino. Trevino asked Defendant how much cocaine Defendant had swallowed and Defendant answered that it was over half an ounce. Officer Trevino notified Sergeant Jody Coon of Defendant's condition, who then contacted the paramedics. Paramedic Kevin Simmonds arrived and examined Defendant. According to Simmonds's testimony, Defendant was fully alert, with a normal ability to sense and perceive. Defendant's skin and pupils were normal. Simmonds noted that Defendant had an elevated blood pressure and pulse. Defendant also told Simmonds that his skin was "tingling." Simmonds advised Officer Trevino that Defendant should be moved to the Hurley Medical Center.

After Simmonds's examination, Sergeant Terence Green spoke with Defendant. Green testified that Defendant was not sweating, agitated, or belligerent, nor that Defendant indicated that he wanted to go to the hospital. Instead, Green testified that Defendant was very cooperative, calm, and attentive. Green advised Defendant of his Miranda rights and Defendant acknowledged that he understood them. Green testified that he asked Defendant if the Lyon residence could be searched and that Defendant gave oral consent. Green further testified that when Defendant was asked whether he would give written consent, Defendant hesitated because he wanted to exclude anyone else from potential liability if additional cocaine was found at the residence. Green then wrote the

2

following on the bottom of the consent form: "This is all on James. No one else will be involved in the house." After this addendum was included, Defendant signed the consent form. Green and Trevino also signed the form.

Almost immediately after Defendant signed the consent form, Defendant left the police station for the hospital. The exact timing of Defendant's departure from the police station is in dispute, but based on the different accounts it appears that Defendant left sometime between 8:45 and 8:55 p.m. The emergency doctor on duty, Doctor Borgialli, testified that when he saw Defendant at approximately 10:01 p.m., Defendant was sweating profusely, was agitated and hostile, was hallucinating, and had to be restrained. Defendant was treated for cocaine overdose and remained in the hospital for several days.

Defendant has a slightly different account of what happened at the police station. Defendant alleges that he told Officer Trevino to take him to the Hurley Medical Center. Defendant testified that he overheard Paramedic Simmonds state to police that Defendant should be brought to the hospital immediately, and that after hearing this comment, Defendant was scared for his life. Defendant testified that Green told Defendant, "I won't help you if you don't help me," and that Defendant understood this to mean that future medical attention was conditioned on giving consent to the search. Defendant denies that he had a conversation with Green about affixing the addendum to the bottom of the consent form. Defendant alleges that because the police delayed in getting Defendant to the hospital and because Defendant believed that receipt of further medical attention was contingent on his signing the consent form, Defendant felt pressured to sign the consent form.

In response, the police deny that they ever indicated to Defendant that he would only go to the hospital if Defendant signed the consent form and they deny that anyone ever said something similar to "I won't help you if you don't help me."

Defendant claims that his statements and his consent to search were not made freely or voluntarily because of the withholding of medical treatment from Defendant at the police station. Consequently, Defendant moves to suppress the oral and written statements granting consent to search the Lyon Street residence. Defendant also moves to suppress any evidence seized from the resulting search of the home.

**II.     Analysis**

"The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects. The prohibition does not apply, however, to situations in which voluntary consent has been obtained . . . from the individual whose property is searched." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citations omitted). Consent, however, must "not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973). Instead, consent must be "freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). It is the government's burden to prove that a valid consent was obtained and "that the consent was uncontaminated by duress, coercion, or trickery." *United States v. Jones*, 641 F.2d 425, 429 (6th Cir. 1981). "Whether consent was free and voluntary so as to waive the warrant requirement of the Fourth Amendment is 'a question of fact to be determined from the totality of all the circumstances.'" *United States v. Carter*, 378 F.3d 584, 587 (quoting *Schneckloth*, 412 U.S. at 227).

At the evidentiary hearing, there was a question as to whether Defendant actually resided at 1123 Lyon Street. In response, the government submitted evidence to the Court consisting of a letter, a receipt, and a cable bill with Defendant's name and giving 1123 Lyon Street as his address. Therefore, the Court finds that Defendant was a resident of 1123 Lyon Street.

Defendant first argues that he was suffering the effects of the cocaine at the police station. He alleges that when he first arrived at the police station, his knees buckled upon exiting the police vehicle. The testimony of the police officers contradicts this account, as the police testified that they did not notice Defendant having any trouble when he first arrived at the station, nor see his knees buckle.

Defendant also alleges that he felt "high" at the police station, that he told the police that his tongue was numb, and that he told the paramedic that his skin was tingling. Even if this were so, the rest of the witnesses' testimony and other evidence indicate that Defendant was coherent, rational, and cooperative, and had no outward signs or symptoms of a drug overdose. The officers who had contact with Defendant at the station all testified that he looked normal, spoke clearly, and was cooperative. Paramedic Simmonds, who examined Defendant at the station, testified that all of Defendant's vital signs were normal except for an elevated blood pressure and pulse. Paramedic Simmonds also testified that when he examined Defendant, Defendant had the highest possible score on an alertness test that Simmonds conducted. Green testified that, during his conversation with Defendant, Defendant did not appear to be under the influence of the ingested cocaine, but was coherent and fully alert. In fact, Defendant did not simply sign the consent form, but requested that an addendum be made to the consent form explaining that any incriminating evidence discovered

5

at 1123 Lyon Street would be on him and not on any other resident of the house. It is clear that by 10:01 p.m. when Doctor Borgialli saw Defendant at the hospital, Defendant was hallucinating and suffering other effects of the ingested cocaine. However, from the totality of the circumstances, the Court finds that up until the time that Defendant left the police station sometime before 9:00 p.m., Defendant was not suffering from the effects of cocaine and had full consciousness and awareness of his situation.

Defendant's strongest argument in support of his motion to suppress is that his consent to search was not given freely and voluntarily because the environment at the police station was coercive as Defendant believed that medical treatment and a visit to the hospital would be withheld unless he consented to the search. Defendant argues that he overheard the paramedic tell Green that Defendant needed to be brought to the hospital and that this made him scared for his life. Defendant alleges that Green told Defendant that if Defendant didn't help Green, Green wouldn't help Defendant. Defendant allegedly understood this to mean that Green was going to prevent Defendant from getting to the hospital unless Defendant consented to the search of his home. According to Defendant, because he was allegedly afraid for his life and because he believed the police were not going to let him go to the hospital, he signed the consent form involuntarily.

The testimony from Antcliff, Trevino, and Green all contradict Defendant's allegations. The police witnesses unequivocally denied that there was any intimation to Defendant that he would go to the hospital only if Defendant signed the consent form. The police also denied that anything like "If you don't help us, we won't help you" was ever said to Defendant. Instead, the police testified that Defendant was coherent, cooperative, and did not ask for additional medical attention. The

6

testimonies of the police officers support a scenario where there was no coercion when Defendant was being questioned at the police station and where additional medical attention was not conditioned on Defendant's grant of consent.  Though the scenario described in Defendant's testimony contradicts that of the three police officers, this Court finds the testimonies of the officers to be more credible than that of Defendant.  Therefore, after considering the totality of the circumstances and after weighing the testimonies and other evidence, the Court concludes that the police did not coerce Defendant into signing the consent form by withholding or threatening to withhold proper medical care, and that Defendant consciously, freely, and voluntarily gave his consent to search the 1123 Lyon Street residence.

**ACCORDINGLY, IT IS HEREBY ORDERED** that Defendant's motion to suppress [docket entry 11] is **DENIED**.

**SO ORDERED.**

Dated:   June 26, 2006                                          s/Paul V. Gadola
                                                                HONORABLE PAUL V. GADOLA
                                                                UNITED STATES DISTRICT JUDGE

---

Certificate of Service

I hereby certify that on    June 27, 2006  , I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:            James C. Mitchell; Kenneth Scott                    , and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:                                                                                     .

                                                                s/Ruth A. Brissaud
                                                                Ruth A. Brissaud, Case Manager
                                                                (810) 341-7845